STATE OF MAINE
SAGADAHOC, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-98-006
TEH-SAG- 1/31/2000

PATRICK N. McTEAGUE, ET ALS,
as Trustees of the 17A Realty Group Trust,

Plaintiffs

vs.

**DECISION AND ORDER**

STATE OF MAINE, DEPARTMENT OF
TRANSPORTATION,

Defendant

This matter is before the court on the appeal, *de novo*, of the defendant (hereafter, "DOT") from a determination and award of damages by the State Claims Commission and is brought pursuant to 23 M.R.S.A. § 157.

## BACKGROUND[1]

The plaintiffs (hereafter, collectively, "Trust") are the owners of property on the northerly side of Route 196 in Topsham, Maine. On July 14, 1987, the town's planning board approved the Trust's application for a five lot subdivision on the property called "Union Park Subdivision" which consisted of 11.35 acres. The approval restricted access to lots in the subdivision from a road to be constructed by the Trust called Union Park Road. Access was not allowed from Route 196. The Trust expended approximately $300,000 for capital improvements in the subdivision, including Union Park Road.

---

[1] Many facts in this case are not in dispute. *See* Stipulations, dated October 21, 1999.

1

DONALD L. GARBRECHT
LAW LIBRARY

FEB 4 2000

In 1987 or 1988, members of the Trust became aware that the DOT was planning to relocate sections of Route 196 to relieve traffic congestion and that the Trust's property might be affected. In 1993 or 1994 the DOT finalized plans for the bypass road connection project between Route 95 in Topsham and Route 1 in Brunswick. The project included the realignment and improvement of Route 196 adjacent to the Union Park Subdivision.

On March 20, 1995, pursuant to its powers of eminent domain, the DOT acquired a total of 1.59 acres of the Trust's property for the road connection.[2] The area taken consisted of .40 acre from Lot 1 in the subdivision, 1.05 acres from lot 5 and .14 acre from the entrance road to the subdivision.[3] After the taking, Lot 5 was reduced to .43 acre, smaller than the town's 20,000 square feet minimum lot size requirement, and its most reasonable use was to combine it with Lot 4.[4] Lot 1 was reduced to 1.70 acres, but remained a lawful buildable lot.

The DOT served a check on the Trust in the amount of $150,000 representing its determination of the net damage and offering price for the acquisition.[5] The Trust, which continues to own all of the remaining lots in the subdivision, rejected this sum and appealed to the State Claims Commission pursuant to 23 M.R.S.A. § 155. The Commission determined

---

[2]See Stipulation ¶ 4. The parties have stipulated that the project met the constitutional and statutory prerequisites of necessity. *See* Stipulations ¶ 5.

[3]See Stipulation ¶ 4.

[4]See Stipulation ¶ 8.

[5]*See* 23 M.R.S.A. § 154

that the Trust's gross damages were $274,138.[6] After allowing for the $150,000 payment by the DOT, the net amount awarded to the Trust by the Commission was $124,138, plus interest of $15,481.54 on the net amount calculated from the date of taking. Dissatisfied with the Commission's determination and award, the DOT appealed, *de novo*, to this court.

## DECISION

Under Maine law, owners of property taken for public use are entitled to "just compensation" for that taking. See Maine Const. Art. I, § 21; *and Orono-Veazie Water Dist. v. Penobscot Cty. Water Co.*, 348 A.2d 249, 255-58 (Me. 1975). Where only a portion of a tract of land is taken and severance damages[7] are claimed, the traditional measure of damages is the difference between the fair market value of the whole tract immediately before the taking, and that of the property remaining immediately after the taking," *Timberlands, Inc. v. Maine State Highway Com'n.*, 284 A.2d 894, 897-98 (Me. 1971). However, the condemnee "is not restricted to the use of this ["before and after"] formulation; rather it is entitled to submit proof of its damages based upon the value of its holdings at their highest and best use." *Merrill Trust Co. v. State*, 417 A.2d 435, 439 (Me. 1980)("plaintiff is entitled to recover the higher value of the land taken, whether or not it asserts a claim for severance damages"). The court agrees with the parties' appraisers that there were no severance damages in this case, that the

---

[6]See Plaintiff's Exhibit 12.

[7]Severance damages are "damages that accrue to the remaining land after a part is taken." *August Realty v. Inhabitants of Town of York*, 431 A.2d 1289, 1291 n. 4 (*citing Merrill Trust Co. v. State*, 417 A.2d at 440).

highest and best use of the property before and after the taking was for commercial development and that the most appropriate method for appraising the property and determining its fair market value is the market approach.

Application of the market approach in this case is hampered by a dearth of its most reliable resource, comparable sales around the date of taking. This is attributable to then-prevailing economic conditions in southern Maine. To make matters more difficult, there was a significant fluctuation in land sales activity and per unit sales prices in the years before and after the DOT's acquisition. Again, the economy was a confounding factor.

Prior to 1987, southern Maine, including the Topsham region, enjoyed aggressive real estate development. Around 1987 or 1988 recessional indicators emerged: some banks began having problems, interest rates and foreclosures rose, the value of real estate projects diminished, and venture capital was nearly nonexistent. In the early 1990's, "survival" was the primary concern of those in the real estate industry and financial relief seemed unavailable. The recession appeared to bottom-out in 1993 or 1994. By mid-1994 there were signs of renewed confidence within the financial industry, although conservative attitudes still prevailed. Then, in 1995 the recovery process began and there was modest reinvestment in the Topsham area. Although the market's "recovery trend was substantially established" by the date of the taking in this case, there was no appreciable increase in

4

market values "during 1994 through mid to late 1996".[8]

The Trust's appraiser, Albert Childs, felt that a comparable sales analysis should include transactions before and after the date of taking because the DOT's acquisition occurred in the midst of these changes and improvements in economic and market conditions. He observed that there were only a few pre-taking sales available because the economy had only just begun to recover from many years of recession and bottoming out. Thus, Childs included pre- and post-taking sales to determine price shifts and then adjusted those prices to the date of taking using a method he called "paired sales analysis". Conversely, the DOT's appraiser, Harold Sonia, did not consider real estate sales subsequent to the date of taking because he felt that post-taking land values unduly reflected the impact of the DOT's road connection project. Although there is merit to the reasoning of each appraiser, the court concludes in this case that Mr. Sonia's concerns about the impact of the road project on post-taking sales prices is overstated and that Mr. Child's application of the "paired sales analysis" resulting in a simple 8% annual appreciation rate in market values for the period 1994 through 1996 is not a reliable adjustment mechanism.

Tempered by an understanding of the economic factors noted by Mr. Childs and the post-taking impact of the bypass project noted by Mr. Sonia , the court finds that certain of the comparable sales are of sufficient, but varying, evidentiary weight to assist in a determination of the fair market

---

[8]*See* Plaintiffs' Exhibit 10, which is also Defendant's Exhibit 10, Appraisal Report by Albert J. Childs, dated June 18, 1997, at p. 35.

value of the Trust's property taken by the DOT. They include the *Arby's, Wendy's* and *Rite Aid* parcels. The extent to which each of these comparables influences the determination of fair market value is also a function of other factors that bear upon that determination in this case, such as the date of sale of each comparable parcel, its size and proximity to the Trust's property, deed restrictions, and geographic influences.

The *Arby's* property is 1.04 acres (45, 302 square feet) and was purchased in April 1992 at $2.54 per square foot. It is located reasonably close to Union Park Subdivision, about 450 feet away, but the sale occurred three years before the DOT's taking at a time when the economy was still gripped by rescission. The *Wendy's* parcel contains 1.34 acres (58,370 square feet) and was acquired in October 1993 for $4.76 per square foot. It is located about four miles away from the subject property. This sale occurred a year and a half before the eminent domain action at a time when the recession appeared to have "bottomed out". Finally, the *Rite Aid* piece, which comprises 1.53 acres (66,647 square feet), is located closest to the Trust's property. It was sold for $5.84 per square foot in July 1976, about 16 months after the DOT's taking, when the economy's recovery and real estate values were advancing more rapidly than they had in March 1995.

The distinctive circumstances, unique to each of these parcels, prevents a direct correlation of any one of them to the Trust property taken by the DOT. However, they each bear a sufficiently comparable relation to the subject and collectively provide a reasonable sampling of the transitional impact of the economy on land values in the area during a time period that

spans the taking in this case and are relevant to a determination of the Trust's damages.

The parties have stipulated and the court finds that the Trust's damages attributable to the taking of .40 acres from Lot 1 are $45,000. As to the 1.05 acres taken from Lot 5, the court concludes that the Trust's damages are $155,500. Although there are no severance damages in this case, there are, in Mr. Sonia's vernacular, "costs to cure" of $3,000 in order to lawfully join the remainder of Lot 5 with Lot 4. Accordingly, the court finds that the Trust is entitled to an award of just compensation in the total amount of $203,500, together with lawful interest from the date of taking on the difference between this award and the offering price of $150,000 paid by the DOT, to wit: $53,500.

Since the court's determination and award of just compensation, exclusive of interest, is less than the gross damages determined by the State Claims Commission, exclusive of any interest allowed, the DOT is entitled to judgment "for the excess of the gross damage determined by the State Claims Commission, inclusive of interest", over the court's final award of just compensation and for its costs from the time of the appeal. 23 M.R.S.A. § 157.

The Trust seeks an award of reasonable attorney's fees in this case. However, based upon the language of 23 M.R.S.A. § 157, the court concludes that the DOT has "prevailed" on its appeal of the Commission's award and, therefore, the Trust's request for reimbursement of its reasonable attorney's fees cannot be granted.

7

The entry is:

Judgment for Defendant as follows:

The determination and award of the State Claims Commission is vacated and set aside;

Plaintiff is awarded just compensation of $203,500 and Defendant's payment to Plaintiff of $150,000 is applied to this final award;

It is ORDERED that Defendant shall pay to Plaintiff the further sum of $53,500, together with lawful interest thereon from March 20, 1995; and

Defendant is awarded its costs from the time of this appeal.

Dated:   January 31, 2000

_____
Justice, Superior Court